UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CFH EAST 63, LLC, a Delaware limited liability company, 172 RIVINGTON PROPERTY, LLC, a New York limited liability company, and 237 HENRY PROPERTY, LLC, a New York limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> ERIC NELSON, VINTAGE GROUP, LLC, a New York limited liability company, KEYSTONE 63, LLC, a New York limited liability company, PREMIER MAINTENANCE, LLC, a New York limited liability company, and LEGEM HOLDINGS, LLC, a New York limited liability Company, <br><br> Defendants. | **COMPLAINT** <br><br><br> **TRIAL BY JURY DEMANDED** |

Plaintiffs, CFH EAST 63, LLC ("CFH"), 172 RIVINGTON PROPERTY, LLC ("172 Rivington LLC"), and 237 HENRY PROPERTY, LLC ("237 Henry LLC"), by and through their undersigned counsel, as and for their Complaint against Defendants, ERIC NELSON ("Nelson"), VINTAGE GROUP, LLC ("Vintage"), KEYSTONE 63, LLC ("Keystone"), PREMIER MAINTENANCE, LLC ("Premier"), and LEGEM HOLDINGS, LLC ("Legem"), state as follows:

## NATURE OF THE CASE

1.      Defendant Eric Nelson ("Nelson") operated a racketeering enterprise (the "Nelson Enterprise") in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, through his controlled companies, Defendants Vintage, Keystone, Premier, and Legem.  Operating primarily through Vintage, Keystone, Premier, and Legem, Nelson has

enriched himself through a pattern of pervasive mail and wire fraud against his clients, his tenants, and government agencies.

2.     These acts of fraud enabled him, among other things, to loot rental apartment property he managed for the benefit of other properties he controlled; fraudulently facilitate and conceal his extraction of illegally excessive rents from rent-stabilized apartments; fraudulently conceal and perpetuate code violations, fraudulently induce approval of construction expenses; and inflate his management fees based on this unlawful conduct.  Defendants kept their scheme from discovery by engaging in long-term fraud in amounts that were individually small enough to escape notice, but in the aggregate exceeded one million dollars; and in combination with Defendants' violations of state law damaged Plaintiffs in the millions of dollars.

3.     Defendants' long-term pattern of fraud includes:

- Consistently submitting false and fraudulent management reports to Plaintiff CFH on a monthly basis, from 2015 to January 2021, containing hundreds of thousands of dollars of charges that were purportedly for a property Defendants managed for Plaintiff CFH, but that Defendants knew were, in fact, charges that were incurred for properties controlled by Nelson;

- Submitting falsified statements to New York State's Division of Housing and Community Renewal ("DHCR") which contained fictitious tenants and rent amounts in furtherance of a scheme to evade New York's rent-stabilization laws, as well as false statements to Plaintiffs to conceal the scheme from them and to mislead them into approving extensive expenses and leases in furtherance of the scheme;

- Nelson's false statements to Plaintiffs—and submission of a false affidavit to the New York City Department of Buildings ("DOB")—regarding the improper

conversion of apartment units and illegal living spaces in buildings he managed for Plaintiffs, to induce them, based on false pretenses, to authorize construction work and rental agreements in furtherance of Defendants' scheme; and

- Inducing Plaintiffs, who had no experience with operating residential buildings, to place Defendants in the position of trust that enabled these crimes by falsely representing Nelson as a capable and trustworthy manager of such properties.

4. In short, Defendants' enrichment of themselves through pervasive criminal violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, was an ongoing method of doing business for the Nelson Enterprise. Defendants' unlawful conduct, moreover, is of a piece with Nelson's history of reported misconduct in conjunction with his former partner, the notorious Michael Cohen. *See* "*Michael Cohen was a lousy landlord, records show*," https://www.nydailynews.com/new-york/ny-metro-michael-cohen-landlord-20180823-story.html; "*Michael Cohen's partner falsely claimed multifamily buildings had no rent-stabilized tenants: report*," https://therealdeal.com/2018/08/27/michael-cohens-partner-falsely-claimed-multifamily-buildings-had-no-rent-stabilized-tenants-report/amp/.

5. In addition to their RICO violations, Defendants' conduct violated Plaintiffs' rights under New York State law. Under both the faithless servant doctrine and the relevant contracts, Defendants' pursuit of their own interests to the detriment of Plaintiffs' interests and in violation of their duties of loyalty to Plaintiffs, obligate them to forfeit all of the compensation they reaped for their purported services to Plaintiffs.

6. This lawsuit seeks treble damages from Defendants pursuant to RICO's civil remedies provision, 18 U.S.C. § 1964; restitution of all amounts paid to Defendants; compensatory damages for Defendants' violations of state law; breach of contract damages; punitive damages; and Plaintiffs' reasonable attorney's fees and costs.

## PARTIES

7.      Plaintiff CFH is a Delaware limited liability company with its principal place of business located in New York, New York.

8.      Plaintiff 172 Rivington LLC is a New York limited liability company with its principal place of business located in New York, New York.

9.      Plaintiff 237 Henry LLC is a New York limited liability company with its principal place of business located in New York, New York.

10.      Defendant Nelson is an individual who resides in New York, New York and is a citizen of the state of New York.

11.      Defendant Vintage is a New York limited liability company controlled by Defendant Nelson, with its principal place of business located at 381 Park Avenue South, New York, New York.

12.      Defendant Keystone is a New York limited liability company controlled by Defendant Nelson, with its principal place of business located at 381 Park Avenue South, New York, New York.

13.      Defendant Premier is a New York limited liability company controlled by Defendant Nelson, with its principal place of business located at 381 Park Avenue South, New York, New York.

14.      Defendant Legem is a New York limited liability company controlled by Defendant Nelson, with its principal place of business located at 381 Park Avenue South, New York, New York.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically, the Racketeer Influenced and Corrupt

Practices Act ("RICO"), and this Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(a).

16.     This Court has supplemental jurisdiction over the state law claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

17.     This Court has personal jurisdiction over each Defendant as they are all citizens of the state of New York.

18.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because one or more of Defendants is subject to personal jurisdiction in this judicial district and resides in this district.

## COMMON ALLEGATIONS

### The Enterprise

19.     The Nelson Enterprise consists of Nelson, Vintage, Keystone, Premier, and Legem.

20.     At all relevant times, Nelson was an owner and executive of Vintage, Keystone, Premier, and Legem, who controlled and managed each and directed their conduct and affairs.

21.     Nelson has used those entities since at least 2015 as the instrumentalities of his fraudulent activities.

22.     As detailed in this Complaint, Defendants Nelson, Vintage, Keystone, Premier, and Legem (who are culpable persons) have conducted the Nelson Enterprise in a manner that affects interstate commerce through a pattern of racketeering activity to injure Plaintiffs' business interests and expectancies.

### 330 East 63rd Street

23.     Defendants engaged in a multi-year pattern of malfeasance concerning 330 East 63rd Street, New York, NY (the "63rd Street Property"), a multi-use residential apartment building

containing 90 residential units and two commercial offices. The 63rd Street Property was purchased in 2015 by Plaintiff CFH and entities affiliated with Nelson and his then-partner Michael Cohen, as tenants in common, with CFH maintaining approximately a 62% majority ownership interest. The parties executed a February 10, 2015, Tenancy-In-Common Agreement ("TIC Agreement") to govern their relationship as tenants in common. Entities affiliated with Nelson subsequently acquired Cohen's interests.

24.    Nelson represented to the principals of CFH—who had never previously operated residential buildings—that he was a skilled and trustworthy property manager and was capable of managing the property. Accordingly, CFH agreed to have Keystone, an alter ego Nelson controlled and operated, serve as the Property Manager.

25.    On or about February 10, 2015, the tenant-in-common owners of the 63rd Street Property executed a property management agreement with Keystone (the "63rd Street Management Agreement," a copy of which is attached hereto as Exhibit A), pursuant to which Keystone agreed to provide enumerated services for the maintenance, upkeep, and repair of the 63rd Street Property, in exchange for a management fee of five percent (5%) of the gross rentals on the 63rd Street Property.

26.    The payments of that management fee have consistently been directed by Nelson and Keystone to Defendant Legem, which is controlled by Nelson and is located at the same address as Vintage and Keystone—even though the manager was Keystone, not Legem, and CFH never authorized payments to be made to Legem.

27.    Nelson further blurred the lines between Defendants by requiring that "[a]ll communications" related to the 63rd Street Property be addressed to "Keystone 63 LLC . . . Attn: Eric Nelson; Email address: enelson@vintgroup.com," and by removing all obstacles to the free

assignment of the agreement between them.  63rd Street Management Agreement art. IV(F), (H) (allowing assignment without prior written consent to "any entity controlled by Eric Nelson").

28.    Under the 63rd Street Management Agreement, Keystone was to be reimbursed upon submission of receipts for reasonable out-of-pocket expenses it incurred "in connection with the operation of the [63rd Street] Property," and was to provide "operating statements for the [63rd Street] Property to the TIC Owners on a monthly basis."

### The Downtown Properties

29.    The principals of CFH own certain other residential properties in Manhattan through limited liability companies; these were purchased in 2014 from entities controlled by Nelson and Michael Cohen.   These include 172 Rivington Street and 237 Henry Street (collectively, the "Downtown Properties").  Unlike the 63rd Street Property, the principals of CFH maintain 100% ownership of the Downtown Properties, through Plaintiffs 172 Rivington LLC and 237 Henry LLC, respectively.  Each of these entities is a separate limited liability company with a separate corporate existence, and each executed a separate property management agreement with Defendant Vintage, based on Nelson's representations that he was an experienced, knowledgeable, and trustworthy property manager and was capable of managing the properties.[1]

30.    Each of the property management agreements for the Downtown Properties entered into with Vintage was in form and substance the same as the 63rd Street Management Agreement between the TIC Owners and Keystone.

31.    As with the 63rd Street Property, the payments of the 5% management fee have consistently been directed by Nelson and Vintage to Defendant Legem—even though the manager

---

[1] Nelson, through Vintage, managed two other buildings for the principals of the Downtown Properties.  Those buildings were similarly mismanaged but are not included in this federal complaint at present because—in the absence of the documents and information Nelson and Vintage have withheld—the owners do not yet possess evidence that those buildings were subject to the same pattern of mail and wire fraud as Plaintiffs suffered herein.

was Vintage, not Legem, and the owners of the properties never authorized payments to be made to Legem.

32.     As in the 63rd Street Management Agreement, Nelson blurred the lines between Defendants in the "237 Henry Management Agreement" by requiring that "[a]ll communications" related to the property be addressed to "Vintage Group LLC . . . Attn: Eric Nelson; Email address: enelson@vintgroup.com," and by removing all obstacles to the free assignment of the agreement to any Nelson-controlled entity.  *See* 237 Henry Management Agreement art. IV(F), (H).  The same is true of the "172 Rivington Management Agreement."

33.     Although Keystone was created specifically to manage the 63rd Street Property and was nominally separate from Vintage, Keystone and Vintage maintained the same address and phone number and personnel, used a common Vintage credit card account, and frequently conducted business for the 63rd Street Property (which was nominally managed by Keystone) through Vintage.

34.     From 2015 to January 2021, Nelson managed the 63rd Street Property through Keystone, and until December 2020 managed 172 Rivington and 237 Henry Street through Vintage.  In this role, Nelson, Keystone, and Vintage owed fiduciary duties to Plaintiffs and were the repositories of Plaintiffs' trust and confidence.

35.     Among other things, Nelson, Keystone (for the 63rd Street Property), and Vintage (for the Downtown Properties) were responsible for expending funds on behalf of the properties for maintenance, payroll, and other expenses.  In addition to their fiduciary duties obligating them to act solely in the best interests of the building owners that employed them, Nelson, Keystone, and Vintage were subject to contractual duties prohibiting them from seeking to benefit Nelson at the expense of Plaintiffs.  For example, the TIC Agreement for the 63rd Street Property required that all services and repairs besides enumerated "customary activities" "be performed by unrelated

8

third parties," and thereby prohibited Nelson from using his authority as manager to direct building funds to entities he controlled.

36.     Notwithstanding these duties, Nelson, both individually and through Keystone, Vintage, Premier, and Legem, embarked on a six-year pattern of repeated criminal conduct to defraud Plaintiffs and enrich himself at Plaintiffs' expense.

***Nelson Fraudulently Causes CFH to Pay for Expenses of His Personal Properties***

37.     A central part of Defendants' scheme was looting the 63rd Street Property for the benefit of other properties controlled by Nelson, who operated at least thirteen other buildings in Manhattan and the Bronx.  The scheme involved falsely and fraudulently attributing to the 63rd Street Property expenses incurred by and for the benefit of Nelson's other properties.

38.     To facilitate the fraudulent shifting of expenses from Nelson's other interests to the 63rd Street Property, Nelson commingled expenses by using a common American Express account in the name of Vintage for multiple properties controlled and/or managed by Nelson.  The Vintage account was used even though a nominally separate entity, Keystone, was the managing agent of the 63rd Street Property.  Defendants then purported to submit for payment by the 63rd Street Property charges supposedly incurred for that property, but in actuality, and on a regular basis, falsely submitted expenses incurred for Nelson's other properties, and Keystone paid those expenses from the operating account for the 63rd Street Property.

39.     As a result, the monthly operating statements to CFH, as well as the documentation purportedly supporting payment of the Vintage American Express card statements, were fraught with fraudulent charges, adding up to hundreds of thousands of dollars.

40.     Defendants further misappropriated from Plaintiffs by using the services of employees of the 63rd Street Property to perform work for Nelson's other properties.  This included using the superintendent of the 63rd Street Property (whose salary, health insurance, and

rent were paid by the TIC Owners (approximately 62% by CFH) and who was to be working full-time on the 63rd Street Property) to divert services and funds to other properties controlled by Nelson.  Nelson did so for his personal enrichment and in derogation of Keystone's duty to properly manage the 63rd Street Property.

41.     Nelson gave the superintendent for the 63rd Street Property, which was nominally managed by Keystone, an American Express card on the Vintage account to use for 63rd Street Property expenses, but instructed him to use the same card for expenses (such as extensive Home Depot purchases) incurred for work at Nelson's properties.  Many of those expenses were then fraudulently submitted and reimbursed as expenses of the 63rd Street Property, along with the expense of taxi, Uber, and Lyft rides to and from Nelson's other properties.  Nelson, individually and through Vintage and Keystone, thereby fraudulently shifted costs from his properties to the 63rd Street Property.

42.     In particular, Nelson controlled multiple properties in Manhattan and the Bronx that are remote from the 63rd Street Property, including the following:

- 2473 Arthur Avenue, Bronx, NY 10458

- 2475 Arthur Avenue, Bronx, NY 10458

- 2477 Arthur Avenue, Bronx, NY 10458

- 2479 Arthur Avenue, Bronx, NY 10458

- 2482 Hoffman Street, Bronx, NY 10458

- 575 East 189th Street, Bronx, NY 10458

- 2460 Lorillard Place, Bronx, NY 10458

- 309 East 83rd Street, New York, NY 10028

- 67 Sullivan Street, New York, NY 10012

- 219 Mulberry Street, New York, NY 10012

- 80 Delancey Street, New York, NY 10002

- 55 East Houston Street, New York, NY 10012

- 221 East 28th Street, New York, NY 10016

43.     Unbeknownst to CFH and without its consent, Nelson—in derogation of his duty to properly manage the 63rd Street Property and use its resources for the benefit of the building—was directing the full-time superintendent of the 63rd Street Property to leave the building and travel to Nelson's other properties and provide maintenance and upkeep services for those properties.  Nelson had the superintendent use the Vintage American Express card to make charges for items for Nelson's other properties, often at vendors near those other properties, and then, through Keystone, regularly submitted such charges, along with taxi, Lyft, and Uber charges for the superintendent's associated travel, for payment as expenses for the 63rd Street Property.  These expenses were falsely and fraudulently included by Nelson and Keystone on the monthly management reports and general ledger as purported expenses of the 63rd Street Property.

44.     Defendants have refused, despite numerous requests and their contractual obligations, even to provide many of the American Express bills—let alone underlying receipts—for expenditures Nelson and Keystone represented and obtained reimbursement for as expenses of the 63rd Street Property.  Under the 63rd Street Management Agreement, Keystone was required to submit receipts for all out-of-pocket expenses, yet Nelson and Keystone have refused to provide receipts for the expenses charged using the American Express account.  Nelson and Keystone have even withheld many of the American Express bills themselves, despite directing reimbursement to themselves for those bills as purported expenses of the 63rd Street Property.  Nelson, through his attorney, ultimately flatly refused to provide the missing American Express statements or other

11

documents to substantiate the claimed expenses—notwithstanding his contractual obligation to do so—falsely asserting that "[y]ou received enough info to know that nothing untoward occurred."

45.     For example, for the years 2015 and 2016, Defendants caused the 63rd Street Property to pay over $100,000 of American Express charges, but have withheld American Express bills for those entire years.  Defendants have likewise withheld the American Express bills for the reporting periods September through December 2017, January and November 2020, and January 2021.  And even for the months as to which they provided bills, Defendants have provided only partial and/or redacted bills.

46.     Nonetheless, even the limited American Express bills that have been provided reflect Defendants' pattern of falsely and fraudulently attributing to the 63rd Street Property expenses incurred for other properties.  For example, the bills reflect an extraordinary $52,087 in purchases, purportedly for the 63rd Street Property, at the Home Depot locations at 600 Exterior Street and 2560 Bruckner Boulevard, both in the Bronx—not coincidentally, where seven of Nelson's properties were located—despite the fact that a large and well-stocked Home Depot is located at 980 Third Avenue, mere blocks from the 63rd Street Property, and numerous other hardware stores are nearby.

47.     In addition, when the superintendent made purchases from a single vendor for multiple properties, it was his practice to charge the purchases for each building separately.  Yet on numerous occasions, Defendants represented all of such multiple purchases as belonging to the 63rd Street Property.

48.     Defendants' consistent misrepresentation of expenses incurred for other properties as expenses of the 63rd Street Property is also reflected in the extraordinarily inflated levels of maintenance expenses purportedly incurred for the 63rd Street Property during Keystone's tenure as manager.  During the three-year period (2012-2014) prior to Nelson and Keystone assuming

management of the 63rd Street Property, the annual maintenance expenses ranged from $77,215 to $114,920.  In 2015 (Keystone's first year as manager), Defendants incurred $214,823 of purported maintenance expenses, and by 2018 those expenses reached an extraordinary $337,343.  Even during the COVID-19 pandemic in 2020, when there were record numbers of vacancies, maintenance expenses for the 63rd Street Property exceeded $291,000.[2]

49.     Defendants fraudulently shifted costs at levels that were not high enough on a monthly basis to make their scheme obvious, but did so pervasively and continuously, with falsely-represented charges in every month for which Plaintiffs have been able to review American Express bills.  A chart detailing the charges Plaintiffs have thus far been able to identify as fraudulently charged to the 63rd Street Property is attached hereto as Exhibit B and incorporated herein by reference.

50.     A month-by-month summary of the amounts of these fraudulently-assigned charges is attached hereto as Exhibit C.  In the case of multiple simultaneous charges that Defendants improperly billed entirely to the 63rd Street Property—such that at most one (and possibly none) of the charges was for the property—the fraudulent amount is calculated as a range, to account for the possibility that one of the charges was proper.  For the periods for which American Express bills were provided—a total of 42 months—Keystone fraudulently claimed between $79,878 and $170,209 for American Express charges that were not incurred for the 63rd Street Property.  An additional $26,816 were "phantom" charges: amounts paid in excess of *all* the transactions reflected on the American Express bills provided for a given month.  And Keystone claimed yet

---

[2] Upon the replacement of Nelson and Keystone as manager in February 2021, the new management company found the 63rd Street Property in a state of substantial disrepair and with numerous apartments unfit for occupancy, despite the extraordinary maintenance expenses purportedly incurred for the property.

an additional $193,633 for American Express charges in months for which Defendants have refused to provide any American Express bills at all.

51.     These amounts reflect only the fraudulent and improper expenses of which Plaintiffs have become aware to date, through the limited American Express bills they were provided.  Plaintiffs expect that additional misconduct contributing to the extraordinary expense levels of the 63rd Street Property under Nelson's and Keystone's management may be identified with the aid of judicial process.

52.     Defendants' false statements regarding the American Express charges, most of which related to materials and transportation costs for the superintendent's work at Nelson's properties, are as follows:

53.     For the January 2017 reporting period, Keystone claimed falsely inflated expenses for the 63rd Street Property that included approximately $4,854 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $731 and $1,767 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, a $122.57 purchase at Eagle Tile, 2250 Second Avenue, New York, NY, on December 5, 2016, followed by a $21.62 taxi trip from Eagle Tile to an address more than 10 blocks away from the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

54.     Defendants' management report for February 2017 reported falsely inflated expenses for the 63rd Street Property that included approximately $9,558 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $429 and $853 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on January 12,

2017, adding up to $298.46.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one (if not both) of the Home Depot charges was for another property, yet Defendants represented that both were for the 63rd Street Property.  Defendants' February 2017 report included $840 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

55.     Defendants' management report for April 2017 reported falsely inflated expenses for the 63rd Street Property that included approximately $7,029 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $339 and $1,057 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, a March 7, 2017 charge of $181.81 at Beacon Paint & Hardware, 372 Amsterdam Avenue, New York, NY, accompanied by a taxi trip from that location to an address on the West Side of Manhattan.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

56.     Defendants' management report for May 2017 reported falsely inflated expenses for the 63rd Street Property that included approximately $9,713 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $764 and $3,640 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at First Avenue Supply House (1587 First Avenue, New York, NY) totaling $1,169.87 and two separate charges at Home Depot totaling $1,230.51, all from April 19, 2017.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least

two of the First Avenue Supply House charges and at least one of the Home Depot charges were for another property, yet Defendants represented that all of these purchases were for the 63rd Street Property.   Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

57.     Defendants' management report for June 2017 reported falsely inflated expenses for the 63rd Street Property that included approximately $18,397 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $2,006 and $5,553 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate June 8, 2017 charges at a Home Depot in the Bronx, totaling $985.21.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both of these purchases were for the 63rd Street Property.   And both charges were at a Home Depot location in the Bronx (where Nelson controlled properties at which he had the superintendent do work), despite the existence of a Home Depot location in Manhattan a short walk from the 63rd Street Property; the June 2017 report included $1,903 of charges incurred at a Home Depot in the Bronx.   Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

58.     Defendants' management report for August 2017 reported falsely inflated expenses for the 63rd Street Property that included approximately $10,745 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $2,807 and $4,227 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, a July 18, 2017 $713.07 charge at a Home Depot in the Bronx, as well as a $28.50 taxi charge for a trip from the 63rd Street Property to a Bronx address.   In total, the

August 2017 report included $1,632 of charges incurred at a Home Depot in the Bronx. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, separate and apart from misrepresenting American Express charges as incurred for the 63rd Street Property, Defendants represented the total American Express charges for the period as $10,745, but the American Express bills for the period total only $10,101, meaning they obtained $644 in reimbursement for phantom charges.  Defendants subsequently repeated this tactic in later periods, often falsely claiming American Express charges thousands of dollars higher than the actual total of the American Express bills.

59. Defendants have failed to provide any American Express bills or other documentation of the American Express charges they represented as incurred for the 63rd Street Property for the reporting periods of September, October, November, and December 2017.  In this period, they claimed American Express charges of, respectively, $10,203, $10,281, $6,290, and $11,227, a total of $38,001.  Upon information and belief, based upon Defendants' consistent pattern of falsely shifting unrelated costs to the 63rd Street Property, these statements were fraudulently inflated by the inclusion of expenses unrelated to the 63rd Street Property.

60.    Defendants' management report for January 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $8,764 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $862 and $1,429 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, a December 16, 2017 $33.50 taxi ride from the 63rd Street Property to East Fordham Road in the Bronx, one block from Nelson's Arthur Avenue properties, and a $55.38 taxi ride from the Bronx back to the 63rd Street Property approximately 3 hours later.  Defendants

directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

61.     Defendants' management report for February 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $7,951 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $1,476 and $2,953 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate Home Depot charges on January 3, 2018, adding up to approximately $513.09, and two taxi trips that same day that were each in excess of $40—at least one of which was a trip from the Bronx back to the 63rd Street Property.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

62.     Defendants' management report for March 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $9,285 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $1,069 and $1,900 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on February 8, 2018, totaling $569.38.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' March 2018 report also included $1,075 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd

Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the March 2018 report includes $395 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

63.     Defendants' management report for April 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $9,718 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $1,828 and $3,731 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at a Home Depot in the Bronx on March 22, 2018, totaling $374.00.  (In addition, three U-Haul charges on the same date, totaling 233.16, were included on the May 2018 report.)  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges were for another property, yet Defendants represented that all were for the 63rd Street Property.  Defendants' April 2018 report included $1,794 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

64.     Defendants' management report for May 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $14,060 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $4,472 and $8,623 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at a Home Depot in the Bronx on April 6, 2018, totaling $485.94, accompanied by a U-Haul charge on the same date of $86.53.  As previously alleged, the superintendent charged purchases from the same vendor separately when each

purchase was for a different property, meaning at least two of the Home Depot charges were for another property, yet Defendants represented that all were for the 63rd Street Property. Defendants' May 2018 report also included $3,505 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

65.     For the June 2018 reporting period, Defendants claimed approximately $14,175 of expenses charged using American Express were for the 63rd Street Property. These reported expenses were fraudulently inflated by the inclusion of between $2,955 and $6,433 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, four separate Home Depot charges on April 30, 2018, totaling $482.50. As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least three of the Home Depot charges were for other properties, yet Defendants represented that all were for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property. In addition, Defendants claimed $3,894 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

66.     Defendants' management report for July 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $4,245 of expenses charged using American Express. These reported expenses were fraudulently inflated by the inclusion of between $1,552 and $2,415 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, five separate Uber and taxi charges on June 8, 2018, totaling $97.28.

Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

67.    Defendants' management report for August 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $12,859 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $2,887 and $5,843 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at Home Depot on August 9, 2018, totaling $633.73.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.   Defendants' August 2018 report also included $1,099 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.   Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.   In addition, the August 2018 report includes $131 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

68.    Defendants' management report for October 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $11,763 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $3,913 and $7,543 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on August 25, 2018, totaling $915.59, and three separate U-Haul charges on the same date totaling $237.37.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges and two of

the U-Haul charges were for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' October 2018 report also included $1,950 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the October 2018 report includes $1,002 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

69.     Defendants' management report for November 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $16,770 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $3,297 and $7,641 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on October 14, 2018, totaling $539.85.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' November 2018 report included $2,688 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the November 2018 report includes $1,419 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

70.     Defendants' management report for December 2018 reported falsely inflated expenses for the 63rd Street Property that included approximately $7,599 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of

between $2,022 and $3,777 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, four separate charges at Home Depot on November 14, 2018, totaling $640.45. As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least three of the Home Depot charges were for another property, yet Defendants represented that both purchases were for the 63rd Street Property. Defendants' December 2018 report included $1,063 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property. In addition, the December 2018 report includes $368 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

71.     Defendants' management report for January 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $14,284 of expenses charged using American Express. These reported expenses were fraudulently inflated by the inclusion of between $1,806 and $4,145 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two taxi rides totaling $52.14 on December 4, 2018 (a day when there were no purchases for the 63rd Street Property, but the superintendent traveled to the Bronx and made purchases at Home Depot for other properties). Defendants' January 2019 report included $1,000 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property. In addition, the January 2019 report includes $4,444 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

72.     Defendants' management report for February 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $6,946 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $1,784 and $3,242 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges on January 10, 2019 at the Home Depot in Manhattan, totaling $411.87, and two the same day at the Home Depot in New Rochelle, NY, totaling $144.98.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Manhattan Home Depot charges and at least one of the New Rochelle charges were for another property, yet Defendants represented that all were for the 63rd Street Property.  Defendants' February 2019 report included $1,099 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the February 2019 report includes $256 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

73.     Defendants' management report for March 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $4,258 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $743 and $1,111 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at Home Depot on January 29, 2019, totaling $427.01, and two taxi trips the same day with fares of $33.54 and $34.19.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges was for another property,

yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the March 2019 report includes $722 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

74.     Defendants' management report for April 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $8,191 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,011 and $4,364 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on March 2, 2019, totaling $530.22.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' April 2019 report included $1,170 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

75.     Defendants' management report for May 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $10,937 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,169 and $5,127 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on April 17, 2019, totaling $848.53.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home

Depot charges were for another property, yet Defendants represented that all were for the 63rd Street Property. Defendants' May 2019 report also included $3,208 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

76.     Defendants' management report for June 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $6,919 of expenses charged using American Express. These reported expenses were fraudulently inflated by the inclusion of between $2,030 and $4,543 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on May 15, 2019, totaling $832.60, as well as a $34.19 taxi trip on that date. As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property. Defendants' June 2019 report included $853 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

77.     Defendants' management report for July 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $23,752 of expenses charged using American Express. These reported expenses were fraudulently inflated by the inclusion of between $6,187 and $11,756 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at a Home Depot in the Bronx on June 21, 2019, totaling $486.55. As previously alleged, the superintendent charged purchases from the

same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' July 2019 report included $4,976 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

78.    Defendants' management report for September 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $16,802 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $3,432 and $8,096 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at Home Depot on August 14, 2019, totaling $659.08, and three separate charges that day at Janovic Paint Decorating totaling $997.06.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges (if not both) and at least two of the Janovic charges were for another property, yet Defendants represented that all of these purchases were for the 63rd Street Property.  Defendants' September 2019 report included $4,334 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

79.    Defendants' management report for October 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $12,686 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,199 and $4,577 of expenses unrelated to the 63rd Street Property as set forth on Exhibit

B, including, for example, two separate charges at a Home Depot in the Bronx on August 30, 2019, totaling $558.89.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' October 2019 report included $1,834 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the October 2019 report includes $1,017 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

80.    Defendants' management report for November 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $11,375 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,456 and $3,944 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, four taxi and Lyft charges on September 28, 2019 (a Saturday), totaling $78.82—at least two of which originated in the Bronx—and no other transactions that could even arguably have provided a reason for taxi travel related to the 63rd Street Property.  Defendants' November 2019 report included $613 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the November report includes $2,328 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

81.     Defendants' management report for December 2019 reported falsely inflated expenses for the 63rd Street Property that included approximately $9,353 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,313 and $5,453 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two Lyft trips to the Bronx on November 20, 2019—a $43.96 trip to 8 West Fordham Road in the Bronx, and a $12.72 trip from Yonkers to 2974 Briggs Avenue in the Bronx.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

82.     Defendants' management report for February 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $8,387 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $660 and $1,582 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on January 21, 2020, totaling $403.89, and two charges the same day at Quality Tile totaling $136.10.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges and at least one of the Quality Tile charges were for another property, yet Defendants represented that all of the purchases were for the 63rd Street Property.  Defendants' February 2020 report included $651 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the February 2020 report includes $2,514 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

83.     Defendants' management report for March 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $10,676 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $1,186 and $2,332 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, five separate charges at a Home Depot in the Bronx on January 27, 2020, totaling $282.27, and a $31.00 taxi trip the same day.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least four of the Home Depot charges were for another property, yet Defendants represented that all the purchases were for the 63rd Street Property.   Defendants' March 2020 report included $1,229 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.   Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

84.     Defendants' management report for April 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $12,399 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $691 and $2,044 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at Home Depot on April 5, 2020, totaling $410.18. As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' April 2020 report included $580 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented

that they were for the 63rd Street Property.  In addition, the April 2020 report includes $2,392 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

85.     Defendants' management report for June 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $8,065 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $2,604 and $4,845 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on May 14, 2020, totaling $688.02.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges were for another property, yet Defendants represented that all the purchases were for the 63rd Street Property.  Defendants' June 2020 report included $1,260 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

86.     Defendants' management report for July 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $11,503 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $1,315 and $3,466 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, four separate charges at a Home Depot in the Bronx on June 9, 2020, totaling $343.60.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least three of the Home Depot charges were for another property, yet Defendants represented that all the purchases were for the 63rd Street Property.  Defendants' July 2020 report included $639 of purchases at a

Home Depot in the Bronx that they represented were incurred for the 63rd Street Property. Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the July 2020 report includes $4,034 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

87.     Defendants' management report for August 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $14,779 of expenses charged using American Express.   These reported expenses were fraudulently inflated by the inclusion of between $2,397 and $5,754 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, a mid-afternoon Lyft trip on July 7, 2020 from near the 63rd Street Property to East 136th Street in the Bronx, for a $28.09 fare, and another Lyft trip the same afternoon, for $23.19, from East 136th Street to one of Nelson's properties on Arthur Avenue in the Bronx; followed on July 8, 2020 by two separate charges at Home Depot, totaling $513.20, and a Lyft trip from Nelson's property at 2482 Hoffman Street in the Bronx to the 63rd Street Property, for a fare of $41.65.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges was for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' August 2020 report included $1,267 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.   Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.  In addition, the August 2020 report includes $1,063 of phantom charges purportedly for purchases with American Express, in excess of the total of the American Express bills.

88.     Defendants' management report for September 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $17,965 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $3,984 and $9,360 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on August 20, 2020, totaling $752.01, and two charges the same day at Janovic Paint Decorating totaling $536.65.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges and at least one of the Janovic charges were for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' September 2020 report included $3,379 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

89.     Defendants' management report for October 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $12,571 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $3,261 and $6,864 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, two separate charges at Home Depot on September 16, 2020, totaling $329.51, and two charges the same day at Janovic Paint Decorating totaling $232.87.   As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least one of the Home Depot charges and at least one of the Janovic charges were for another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' October 2020 report included $2,083 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street

Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

90.     Defendants' management report for December 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $15,372 of expenses charged using American Express.  These reported expenses were fraudulently inflated by the inclusion of between $3,239 and $8,219 of expenses unrelated to the 63rd Street Property as set forth on Exhibit B, including, for example, three separate charges at Home Depot on November 14, 2020, totaling $365.21, and two charges the same day at Janovic Paint Decorating totaling $547.51.  As previously alleged, the superintendent charged purchases from the same vendor separately when each purchase was for a different property, meaning at least two of the Home Depot charges and at least one of the Janovic charges were for a another property, yet Defendants represented that both purchases were for the 63rd Street Property.  Defendants' December 2020 report included $3,127 of purchases at a Home Depot in the Bronx that they represented were incurred for the 63rd Street Property.  Defendants directed this activity and knew expenses were not for the 63rd Street Property, yet falsely and fraudulently represented that they were for the 63rd Street Property.

91.     Defendants have failed to provide any American Express bills or other documentation of the American Express charges they represented on their management reports as incurred for the 63rd Street Property for the reporting periods of January 2020 and November 2020.  In these periods, they claimed American Express charges of, respectively, $12,225 and $18,179.  In January 2021—with the knowledge that Keystone's term as manager was expiring as of February 2021 and would not be renewed—Nelson and Keystone claimed American Express charges of $18,635 but refused to provide any American Express statements (let alone underlying purchase receipts) to substantiate those expenses. Upon information and belief, based upon Defendants' consistent pattern of falsely shifting unrelated costs to the 63rd Street Property, all of

these statements were fraudulently inflated by the inclusion of expenses unrelated to the 63rd Street Property.

92.     Defendants have likewise failed to provide any American Express bills or other documentation of the American Express charges they represented as incurred for the 63rd Street Property for the entirety of 2015 and 2016.  Defendants' management reports for 2015 and 2016 represented that the 63rd Street Property incurred approximately $54,346 of expenses charged using American Express in 2015 and approximately $52,219 in 2016.  Upon information and belief, based upon Defendants' consistent pattern of falsely shifting unrelated costs to the 63rd Street Property, these statements were fraudulently inflated by the inclusion of expenses unrelated to the 63rd Street Property.

93.     This pattern of Nelson directing the superintendent of the 63rd Street Property (whose salary, health insurance, and rent are entirely paid by the TIC Owners and who is to be exclusively working at the 63rd Street Property) to take taxis to Nelson's properties to perform services and/or repairs on Nelson's properties and incur charges related to Nelson's properties, and Nelson and Keystone then fraudulently submitting charges unrelated to the 63rd Street Property as expenses of that property unfolded month after month from 2015 to January 2021.

94.     The false and fraudulent reports were submitted by email to CFH, and thereby transmitted by wire in interstate commerce; each American Express charge foreseeably generated interstate wire transmissions for authorization of the charge; and Defendants caused each payment to be submitted to American Express by U.S. Mail.

**_Defendants' Rent-Stabilization Frauds_**

95.     Defendants' pattern of fraud was not limited to American Express charges. Defendants also made a series of fraudulent statements to Plaintiffs and government authorities— including inventing wholly fictitious tenants and rents in official filings—as part of a scheme to

evade New York City rent regulations.  These were not isolated instances that could be claimed to be inadvertent; Nelson and Keystone made up fictitious tenants and rents on multiple occasions and for multiple apartments.

96.     Certain of the apartments at the 63rd Street Property were subject to New York's rent-stabilization laws.  Under those provisions, the rents for these apartments were heavily regulated and often limited to below-market levels; however, under the laws in effect until June 2019, landlords could significantly and permanently increase rents under certain conditions, including investment in renovations to an apartment.  In addition, the apartments could be removed from regulation entirely if they became vacant and had a certain threshold rent ("High Rent Vacancy Deregulation").  Whether the apartments in a building are subject to rent regulation significantly affects the market value of the building.

97.     High Rent Vacancy Deregulation was repealed in June 2019.  As a result, apartments that were not legally deregulated prior to that date became permanently subject to rent-stabilization limits.

98.     Nelson made a series of misrepresentations to Plaintiffs and the DHCR as part of a scheme to deregulate apartments without satisfying the legal requirements for doing so.  Nelson reaped both higher rental income (as part-owner of the 63rd Street Property) and higher management fees (which were calculated as a percentage of gross rentals), while Plaintiffs were induced, based on false information, to approve substantial renovation expenses; were placed at risk of penalties for legally excessive rents; and suffered a diminution in the value of their property because Defendants' resulting failure to deregulate legally before the 2019 repeal has left several apartments permanently regulated and unable to charge market rents.

Apartment 2A

99.     Apartment 2A at the 63rd Street Property became vacant on or about April 30, 2016. In a telephone call on or about April 18, 2016, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $59,000 in renovations along with the permitted vacancy increase would allow the apartment (which was then renting for a legal rent of less than $850 per month) to be rented at a rate in excess of $3,000 per month, which exceeded the High Rent Vacancy Deregulation threshold, and therefore be removed from regulation.  This was false: the proposed renovations and vacancy increase would permit a maximum rent of $2,198 per month and would not permit luxury deregulation.  Based on these false representations, CFH approved the expenditure.

100.    Defendants thereafter arranged to lease Apartment 2A beginning in December 2016 for $3,450 per month, and Nelson falsely represented to CFH in a telephone call at that time that that was a legally permissible rent.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $2,198 per month.  Based on Defendants' false representation, CFH approved the lease.  Beginning in April 2018, Defendants arranged to lease the apartment to a new tenant for $3,090 per month, and Nelson again falsely represented to CFH in a telephone call that that was a legally permissible rent.  In fact, the maximum permissible rent was $2,621 per month.  Based on Defendants' false representation, CFH again approved the lease.

101.    In furtherance of this scheme, Keystone and Nelson—unbeknownst to Plaintiffs— provided blatantly false information to the DHCR.  On or about October 3, 2016, Keystone and Nelson falsely represented to the DHCR that, as of April 1, 2016, a "J. Doherty" leased unit 2A for $2,400 per month.  There is no record of a "J. Doherty" ever having resided at the 63rd Street

Property, and the stated rent was false.  These false statements to DHCR directly contradicted Nelson's statements to Plaintiff CFH.

102.     In 2017, Keystone and Nelson falsely represented to the DHCR that a "Samantha Roberts" leased unit 2A at the 63rd Street Property for $2,832 per month.  There is no record of a "Samantha Roberts" ever having resided at the 63rd Street Property, and the stated rent was false; the actual rent was $3,450.

103.     Nelson and Keystone reported fictitious tenants to DHCR because High Rent Vacancy Deregulation required a vacancy and a stabilized rent reaching a threshold level.  By reporting a fictitious tenant, Nelson and Keystone could report to DHCR that the fictitious tenant moved out, even when there was no actual vacancy.  In addition, Defendants reported fictitious rent amounts because they knew the actual rent being charged exceeded the permissible rent under the rent-stabilization laws.

104.     Defendants' reporting of fictitious tenants and rents to DHCR makes clear that Nelson was fully aware that his representations to CFH—that the renovation expenditures would permit deregulation of the apartment, and that the rents charged (but not reported to DHCR) were legal—were false and fraudulent.

Apartment 3L

105.     Apartment 3L at the 63rd Street Property was vacant at the time the building was purchased by the TIC Owners in early 2015.  In a telephone call in or about February 2015, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $73,000 in renovations along with the permitted statutory vacancy increase would allow the apartment (which was then renting for a legal rent of $933 per month) to be rented at a rate of approximately $4,200 per month, which exceeded the High Rent Vacancy Deregulation threshold, and therefore be removed from regulation.  This was false:  the proposed renovations

and vacancy increase would permit a maximum rent of $2,584 per month and would not permit deregulation.  Based on these false representations, CFH approved the expenditure.

106.    Defendants thereafter arranged to lease Apartment 3L beginning in July 2015 for $4,200 per month, and Nelson falsely represented to CFH by telephone at that time that that was a legally permissible rent.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $2,584 per month.  Based on Defendants' false representation, CFH approved the lease.  Beginning in August 2017, Defendants arranged to lease the apartment to a new tenant for $4,350 per month, and Nelson again falsely represented to CFH by telephone that that was a legally permissible rent.  In fact, the maximum permissible rent was $3,050 per month.  Based on Defendants' false representation, CFH again approved the lease, which Nelson emailed to CFH on August 21, 2017.

107.    In furtherance of the scheme, Keystone and Nelson—unbeknownst to Plaintiffs— provided blatantly false information to the DHCR.  On or about October 3, 2016, Keystone and Nelson falsely represented to the DHCR that as of April 1, 2016, a "Shawn Jones" leased unit 3L for $2,500 per month.  There is no record of a "Shawn Jones" ever having resided at the 63rd Street Property, and the stated rent was false.  These false statements to DHCR directly contradicted Nelson's statements to Plaintiff CFH.

108.    In 2017, Keystone and Nelson falsely represented to the DHCR that a "Peter Smucker" leased unit 3L at the 63rd Street Property for $2,950 per month.  There is no record of a "Peter Smucker" ever having resided at the 63rd Street Property, and the stated rent was false; the actual rent was $4,200.

109.    Defendants' reporting of fictitious tenants and rents to DHCR makes clear that Nelson was fully aware that his representations to CFH—that the renovation expenditures would

permit deregulation of the apartment, and that the rents charged (but not reported to DHCR) were legal—were false and fraudulent.

Apartment 5M

110.    Apartment 5M at the 63rd Street Property became vacant on or about September 30, 2016.  In a telephone call on or about September 7, 2016, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $66,000 in renovations along with the permitted statutory vacancy increase would allow the apartment (which had been renting for a legal rent of approximately $850 per month) to be rented at a rate of approximately $3,000 per month, which exceeded the High Rent Vacancy Deregulation threshold, and therefore be removed from regulation.  This was false:  the proposed renovations and vacancy increase would permit a maximum rent of $2,363 per month and would not permit deregulation.  Based on these false representations, CFH approved the expenditure.

111.    Defendants thereafter arranged to lease Apartment 5M beginning in December 2017 for $3,000 per month, and in a telephone call at that time Nelson falsely represented to CFH that that was a legally permissible rent.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $2,363 per month. Based on Defendants' false representation, CFH approved the lease.  Beginning in November 2018, Defendants arranged a new lease for $3000 per month, and Nelson again falsely represented to CFH that that was a legally permissible rent.  In fact, the maximum permissible rent was $2,812 per month.  Based on Nelson's false representation, CFH again approved the lease.

112.    In furtherance of the scheme, Keystone and Nelson—unbeknownst to Plaintiffs— provided blatantly false information to the DHCR.  In or about July 2018, Keystone and Nelson falsely represented to the DHCR that the apartment was rent-stabilized and being rented for $2,349.50 a month.  These false statements to DHCR directly contradicted Nelson's statements to

Plaintiff CFH.   On or about July 15, 2019, defendants falsely reported to the DHCR that the apartment was vacant on April 1, 2019, and that Defendants were treating the apartment as rent-stabilized.

113.    On or about December 1, 2019, Defendants entered into a market lease with a new tenant at a market rent of $3,200, and in a telephone call at that time Nelson falsely represented to CFH that that was a legally permissible rent.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $2,854 per month.

114.    On or about August 11, 2020, Defendants falsely reported to the DHCR that the apartment was vacant as of April 1, 2020—it was not—and that Defendants were treating the apartment as rent-stabilized.

Apartment 4H

115.    Apartment 4H at the 63rd Street Property became vacant on or about June 30, 2015. In a telephone call on or about June 15, 2015, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $65,000 in renovations along with the permitted statutory vacancy increase would allow the apartment (which was then renting for a legal rent of $1,306) to be rented for approximately $5,000 per month.   This was false:   the proposed renovations and vacancy increase permitted a maximum rent of $2,930 per month.  Based on these false representations, CFH approved the expenditure.

116.    Defendants thereafter arranged to lease Apartment 4H beginning in September 2015 for $5,000 per month, and in a telephone call at that time Nelson falsely represented to CFH that that was a legally permissible rent.  On August 18, 2015, Nelson emailed CFH a copy of the new lease.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $2,930 per month.  Based on Defendants' false representation, CFH approved the lease.

117.    In furtherance of the scheme, Keystone and Nelson—unbeknownst to Plaintiffs—provided blatantly false information to the DHCR.  On or about September 4, 2015, Defendants falsely reported to the DHCR that the apartment was vacant as of April 1, 2015.

118.    On or about October 3, 2016, Defendants falsely reported to the DHCR that as of April 1, 2016, the apartment was treated as rent-stabilized with a legal rent of $2,750.

119.    On or about September 7, 2017, Defendants falsely reported to the DHCR that Apartment 4H was permanently exempt from rent stabilization due to High Rent Vacancy Deregulation.

Apartment 6C

120.    Apartment 6C at the 63rd Street Property became vacant in the first half of 2015.  In a telephone call in or about May 2015, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $61,000 in renovations along with the permitted statutory vacancy increase would allow the apartment (which had been renting for a legal rent of $949 per month) to be rented at a rate of approximately $2,900 per month, which exceeded the High Rent Vacancy Deregulation threshold, and therefore be removed from regulation.  This was false:  the proposed renovations and vacancy increase would permit a maximum rent of $2,361 per month and would not permit deregulation.  Based on these false representations, CFH approved the expenditure.

121.    Defendants thereafter arranged to lease Apartment 6C beginning in August 2015 for $2,900 per month, and in a telephone call at that time Nelson falsely represented to CFH that that was a legally permissible rent.  Nelson emailed a copy of the lease to CFH on August 17, 2015.  In fact, as Nelson knew, the apartment remained subject to rent stabilization, with a maximum permissible rent of $2,361 per month.  Based on Defendants' false representation, CFH approved the lease.

122.     In furtherance of the scheme, Keystone and Nelson—unbeknownst to Plaintiffs—provided blatantly false information to the DHCR.  On or about October 3, 2016, Keystone and Nelson falsely represented to the DHCR that the apartment was rent-stabilized and being rented for $2,750 a month.

123.     On or about September 7, 2017, Defendants falsely reported to the DHCR that apartment 6C was permanently exempt from rent stabilization due to a High Rent Vacancy Deregulation.

Apartment 6N

124.     Apartment 6N at the 63rd Street Property became vacant in or about April 30, 2016. In a telephone call on or about April 15, 2016, Defendant Nelson represented to representatives of Plaintiff CFH that an investment of approximately $52,000 in renovations along with the permitted statutory vacancy increase would allow the rent to be increased to $3,300 per month.  This was false:  the maximum rent was $3,009.

125.     Defendants thereafter arranged to lease apartment 6N beginning in October 2016 for $3,300 per month, and in a telephone call at that time Nelson falsely represented to CFH that that was a legally permissible rent.  In fact, as Nelson knew, the apartment should have been treated as subject to rent stabilization, with a maximum permissible rent of $3,009 per month.  Based on Defendants' false representation, CFH approved the lease.

126.     On or about October 3, 2016, Defendants falsely reported to the DHCR that, as of April 1, 2016, Apartment 6N had been leased at a legal rent of $2,800.

127.     On or about September 7, 2017, Defendants falsely reported to the DHCR that Apartment 6N was permanently exempt from rent stabilization due to High Rent Vacancy Deregulation.

128.     As part of their effort to increase revenues and management fees through fraudulent evasion of the rent-stabilization laws, in addition to creating false tenants and rental amounts, Keystone and Nelson charged illegal and impermissible rents, above what the rent-stabilization rules permitted, to multiple tenants at the 63rd Street Property.  This resulted in the following overcharges during Keystone's and Nelson's tenure as managers of the 63rd Street Property:

| Unit | Rent Overcharge |
|---|---|
| 1E | $1,816 |
| 1G | $2,182 |
| 2A | $35,579 |
| 2G | $2,367 |
| 2L | $2,316 |
| 3A | $2,255 |
| 3F | $2,351 |
| 3L | $86,264 |
| 4A | $197 |
| 4H | $20,703 |
| 4J | $2,315 |
| 5J | $2,233 |
| 5M | $13,549 |
| 6C | $16,897 |
| 6N | $3,203 |
| **Total:** | **$194,228** |

129.    All the while, Nelson and Keystone repeatedly assured CFH in numerous telephone calls and email communications that: (1) all proper rents were being charged to the tenants at the 63rd Street Property; (2) Nelson and Keystone submitted accurate and truthful information to DHCR; and (3) based on the "properly reported" tenants and rents submitted by Nelson and Keystone, Units 2A, 3L, 4H, 5M, 6C, and 6N could be removed from rent stabilization if CFH invested in certain upgrades to the units.

45

130.    All of these statements made by Nelson and Keystone to CFH were false and Nelson and Keystone knew they were false when they were made.

131.    CFH was damaged in multiple ways by this fraudulent scheme:

a. In reliance on Nelson's fraudulent statements, CFH approved (and bore approximately 62% of the cost of) some $654,000 of renovations that in reality did not enable the apartments to be leased at market rents;

b. CFH relied on Nelson's false statements that the apartments were being properly and legally deregulated, and as a result lost the opportunity to legally achieve deregulation before June 2019, when luxury deregulation was repealed.  As a result, three apartments that could and should have been deregulated are now permanently subject to below-market rents, which has diminished the value of the 63rd Street Property by approximately $430,000;

c. CFH relied on Nelson's fraudulent statements in approving leases that—contrary to Nelson's statements—were in excess of the rents permitted by law, with the result that the 63rd Street Property faces hundreds of thousands of dollars of potential liability for rent refunds, interest, attorney fees, and penalties.  Had CFH known the truth, it would not have agreed to rents in excess of what the rent stabilization law permitted, or to Nelson's provision of false information to DHCR.  CFH is now in the process of remedying the issues created by Nelson's unlawful conduct.

### Defendants' Premier Maintenance, LLC Fraud

132.    On multiple occasions in 2020, the 63rd Street Property received and paid invoices from Premier Maintenance, LLC ("Premier") for painting and repairs.

133.    Unbeknownst to CFH, Premier was controlled by Nelson.  By directing Keystone to hire Premier, Nelson was engaging in self-dealing rather than engaging in an arm's-length transaction.

134.    The Premier expenses exceeded $18,000, and they were fraudulent in two ways.

135.    First, under the TIC Agreement, Nelson and Keystone were not permitted to hire an affiliated entity to perform work for the building:  the Agreement provides that all services and repairs besides the enumerated "customary activities" are to "be performed by unrelated third parties."  Nelson and Keystone therefore had a duty to disclose to CFH that Premier was not a third-party entity, but rather one that Nelson controlled.  Moreover, by submitting the Premier invoices to the 63rd Street Property, Defendants were implicitly and falsely representing that Premier was, as required, an "unrelated third part[y]."

136.    Second, the repeated representation that Premier was providing services to the 63rd Street Property was false.  The work Premier purportedly performed was actually done by the building's own staff; tellingly, in the four years before Defendants began fraudulently billing the 63rd Street Property for purported painting work by Premier, there were no payments to any outside vendor for painting.  Defendants, through Premier, thus fraudulently billed the 63rd Street Property for work done by the building's own employees.  To the extent Premier paid any building employee to work beyond his normal hours, such extra hours were necessary only because building employees were often occupied with work for Nelson's other properties.  Any labor at the 63rd Street property paid for by Premier—and in turn passed through to the 63rd Street Property—was effectively payment for work at Nelson's other properties.

137.    Nelson violated his duties, and caused Keystone to violate its duties, to enrich himself through fraudulently induced payments to Premier.

138.    Defendants' management report for February 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $422.20 for work by Premier. This representation was false and fraudulent for the reasons explained above.

139.    Defendants' management report for March 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $352 for work by Premier.   This representation was false and fraudulent for the reasons explained above.

140.    Defendants' management report for May 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $528 for work by Premier.   This representation was false and fraudulent for the reasons explained above.

141.    Defendants' management report for June 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $1,108.80 for work by Premier.   This representation was false and fraudulent for the reasons explained above.

142.    Defendants' management report for July 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $1,707.20 for work by Premier.   This representation was false and fraudulent for the reasons explained above.

143.    Defendants' management report for August 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $2,393.60 for work by Premier.   This representation was false and fraudulent for the reasons explained above.

144.    Defendants' management report for September 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $3,396.80 for work by Premier. This representation was false and fraudulent for the reasons explained above.

145.    Defendants' management report for October 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $2,499.20 for work by Premier. This representation was false and fraudulent for the reasons explained above.

146.    Defendants' management report for November 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $2,587.20 for work by Premier. This representation was false and fraudulent for the reasons explained above.

147.    Defendants' management report for December 2020 reported falsely inflated expenses for the 63rd Street Property that included approximately $3,010 for work by Premier. This representation was false and fraudulent for the reasons explained above.

148.    The false and fraudulent reports were submitted by email to the TIC Owners (including CFH), and thereby transmitted by wire in interstate commerce.

### Defendants' Fraudulent Statements Regarding 172 Rivington

149.    Defendants' pattern of mail and wire fraud extended beyond the 63rd Street Property to the other properties owned by the respective Plaintiffs.  A particularly significant and costly fraud occurred with regard to Nelson's and Vintage's management of 172 Rivington.  As with the 63rd Street Property, Defendants made a series of misrepresentations to both Plaintiffs and regulators.

150.    On or about January 29, 2019, the DOB served notice of a violation dated November 26, 2018, with regard to Unit 1 at 172 Rivington Street, for improperly converting the basement into additional living space for the unit and maintaining the unit as a duplex.  The basement space was required to be used "as a storage space for commercial storefronts in front of the building" and was not permitted to be used as living space.  On February 7, 2019, Nelson emailed a copy of the violation to 172 Rivington LLC.

151.    To the contrary, Nelson repeatedly advised 172 Rivington LLC that the basement living space was permitted in Unit 1 and that 172 Rivington LLC should invest funds to build out the space and market it as a duplex.  In particular, in a telephone call in or about March 2019, Nelson fraudulently stated to representatives of 172 Rivington LLC that he had attended a hearing regarding the violation and had thereby determined that the violation could be cured by limited renovations, while still maintaining the basement living space as part of the duplex apartment. Again in November 2019, Nelson made the same fraudulent representation to representatives of

172 Rivington LLC in a telephone call.  In addition, on or about December 9, 2019, Defendant Nelson emailed 172 Rivington LLC to transmit a proposal for work purportedly "TO LEGALIZE DUPLEX APARTMENT."   172 Rivington LLC, in reliance upon Nelson's representations, invested approximately $60,000 for construction work on Unit 1.

152.    Nelson then proceeded to file a Certificate of Correction with DOB, including an affidavit dated August 17, 2020, in which Nelson fraudulently attested that the violation was corrected, there was "NO OCCUPANCY AT BASEMENT," and "ILLEGAL OCCUPANCY AND USE DISCONTINUED AT BASEMENT LEVEL."  Contrary to this sworn statement, as Nelson was well aware, the basement living space remained as part of Unit 1, including a toilet, washing machine, and sink.

153.    The new manager 172 Rivington LLC hired to replace Nelson and Vintage informed 172 Rivington LLC of Nelson's fraudulent affidavit and 172 Rivington LLC is in the process of correcting it.  172 Rivington LLC will now have to incur the costs of "de-converting" the basement living space in Unit 1 and whatever fee is levied by DOB—all because of Nelson's and Vintage's repeated fraud and misrepresentations.

154.    Defendants similarly concealed from 172 Rivington LLC the impermissible use of Unit 2, which was likewise being rented as a duplex apartment including basement space. Defendants were aware of this illegality—Unit 2 was subject to the same restrictions as Unit 1— yet concealed that from 172 Rivington LLC—which first learned of this issue, too, only through the new manager that replaced Vintage—and rented the apartment to tenants as a duplex.

155.    172 Rivington LLC will have to incur the costs of "de-converting" the basement living space in Unit 2 and is at risk of fines and liability based on the illegal use.

**Defendants' False Statements Regarding 237 Henry**

156.    Nelson and Vintage perpetrated virtually the same scheme with regard to Unit 1D at 237 Henry Street.  Once again, a violation was issued for improperly converting the basement into additional living space.

157.    Nelson fraudulently stated to 237 Henry LLC in numerous telephone calls and email communications that the basement living space was permitted in Unit 1D and that 237 Henry LLC should invest funds to build out the space.  In particular, in a telephone call in or about June 2018, Nelson fraudulently represented to representatives of 237 Henry LLC that the violation could be cured by putting a wall over the shower in the basement, while still maintaining the basement space as part of the duplex apartment.  In addition, on June 4, 2018, Defendant Nelson sent an email fraudulently representing that "we are not allowed to have a shower in the basement, but the sink and toilet is ok."  On June 27, 2018, Defendant Nelson sent an email stating that "we will put a wall over the shower in the basement" to remedy the violation.  237 Henry LLC, in reliance upon Nelson's representations, invested approximately $100,000 to build out the basement as living space for Unit 1D, and rented the unit to a tenant as a duplex.

158.    237 Henry LLC discovered the truth only after hiring a new manager to replace Nelson and Vintage, and will now have to incur the additional costs of "de-converting" the basement living space in Unit 1D and whatever fee is levied by DOB—all because of Nelson's and Vintage's repeated fraud and misrepresentations.

**Defendants' Other Malfeasance and Misfeasance**

159.    Nelson, individually and through Keystone and Vintage, engaged in numerous other misdeeds related to the 63rd Street Property and the Downtown Properties.  For example, $140,000 was spent renovating Apartment 6K of the 63rd Street Property at Nelson's and Keystone's urging.  In or about May 2019, Nelson and Keystone rented Unit 6K to the children of

one of Nelson's acquaintances for $4,500 per month.  The legal rent for the unit (even under rent stabilization) was $4,909 per month.  Nelson not only concealed from CFH that he was providing a reduced rent to friends, but also failed to properly file documentation with DHCR reflecting that $4,500 was a preferential rent.  As a result of that failure, Plaintiffs are barred from increasing the rent based on the higher legal rent of $4,909.   Therefore, Plaintiffs must use the reduced rent of $4,500 as the basis for all future increases, resulting in a large cumulative loss of rental income and a reduction in the value of the building.  This represents a significant loss to CFH resulting from Nelson's and Keystone's misplaced loyalties and Nelson's use of Keystone's role as manager for personal rather than corporate ends.

***Defendants' Breaches of Contract***

160.    Prior to the execution of the property management agreements between Vintage and 172 Rivington LLC and 237 Henry LLC, and between the 63rd Street Property and Keystone, Nelson represented himself as a capable and trustworthy property manager.  Plaintiffs all relied upon Nelson's representations in agreeing to retain Vintage and Keystone, alter egos Nelson controlled and operated, and enter into the property management agreements.

161.    Contrary to what Nelson represented, he in fact was neither capable nor trustworthy.  This became apparent from Defendants' mismanagement of the properties at his direction.  Each property was left in disrepair by Defendants—from which it will take years and hundreds of thousands of dollars to recover.  All the while Nelson, Vintage, and Legem collected fees over a six-year period totaling approximately $302,733 for the Downtown Properties, and Nelson, Keystone, and Legem collected fees of approximately $886,651 for the 63rd Street Property.

162.    At Nelson's direction, Defendants violated multiple provisions of the property management agreements, including:

- The requirement that "Agent shall manage the Property in an efficient and business-like manner having due regard for the age and physical characteristics of the Property, exercising such care and skill as a prudent manager with sophistication and experience in managing properties similar to the Property would exercise." (See art. II(B) of all property management agreements.)

- The requirement that "Agent shall, at all times, act in good faith, in a commercially reasonable manner and in a fiduciary capacity with respect to the proper protection of and accounting for the assets of the [owners], including the Property."  (See *id.*)

- "Subject to the limitations set forth in this Agreement, Agent shall, at the expense of the [owners], use reasonable efforts to take such action as may be reasonably necessary to comply with any and all laws, ordinances, statutes and deed restrictions applicable to the Property and Agent's employees and with all orders regarding the Property by the Board of Fire Underwriters or other similar bodies." (See *id.* art. II(C)(4).)

163.   The issues with these properties range from nuisances (e.g., excessive garbage and sanitation violations) to more serious matters that have needlessly endangered tenants' and the public's safety.

164.   Despite representing himself as a skilled property manager, Nelson, individually and through the other Defendants, failed in numerous respects to carry out the responsibilities of a manager, including frequent failure to remove trash from building areas; failure to maintain the buildings in compliance with legal requirements; illegal rental of units in violation of rent-stabilization laws or restrictions imposed by building codes and/or certificates of occupancy; alteration of units in violation of building codes; and permitting units to fall into such disrepair that they cannot be rented and require substantial investment before they can be offered to tenants.

165.     Indeed, in a meeting with Plaintiffs 172 Rivington LLC and 237 Henry LLC on or about October 29, 2020, when questioned about the neglect of the Downtown Properties, Nelson confessed that he had done "nothing" to discharge his responsibilities.

166.     Defendants' violation of these contract provisions includes, but is not limited to:

- Alteration of apartments at the 63rd Street Property in violation of applicable building codes, resulting in massive costs and potential liability;

- Allowing multiple units to fall into such disrepair that they require extensive repair work before they may be offered for lease;

- Repeatedly entering into no-bid contracts with favored vendors, instead of following the customary practice of soliciting multiple bids to obtain the best price;

- Repeatedly entering into unfavorable vendor contracts;

- Failure to properly perform even the most basic aspects of day-to-day management to keep the buildings clean, functioning, and in good repair; and

- Visiting the buildings only on rare occasions.

167.     The damage to Plaintiffs from these breaches of the management agreements runs into the millions of dollars.

168.     In addition, under each management agreement, the agreed management fee of 5% of gross rentals—a percentage typically charged by high-end building managers—was subject to the important proviso that the fee "shall not exceed the fair market value for the services rendered by Agent."  Due to Defendants' failure to properly discharge their responsibilities, the fair market value of the management services they provided was far below the nearly $1.2 million in management fees Defendants withdrew from the properties' operating accounts as payment for their management services.

*Plaintiffs Discover the Nelson Enterprise and Its Various Fraudulent Activities and Misdeeds*

169.   Eventually, the Nelson Enterprises' fraudulent activities became too brazen and obvious.  Plaintiffs investigated and discovered years of fraud and corruption led by Nelson. Plaintiffs confronted Nelson regarding his failure to properly manage the Downtown Properties. Shockingly, Nelson initially admitted that, despite having collected hundreds of thousands of dollars in management fees, he had completely neglected 172 Rivington, 237 Henry, and related properties he managed, which resulted in numerous citations, fines, and penalties.

170.   Plaintiffs also immediately demanded an accounting, as was their right under the Management Agreements, of all charges and expenses that Nelson and Keystone allegedly incurred on behalf of the properties, including the hundreds of thousands of dollars charged to the 63rd Street Property using the Vintage American Express account.  In response, Nelson refused to produce many of the requested documents, and in particular refused to produce any receipts to substantiate those American Express charges.

171.   All told, for the period 2015 to January 2021, there were $608,337 in American Express charges for which Nelson and, at his direction, Keystone refuse to account.  This includes $186,191 in charges at Home Depot; $31,335 in charges at Janovic Paint Decorating; and $22,263 in charges at First Avenue Supply House.  $52,087 of the Home Depot charges were incurred at Home Depot locations in the Bronx, miles away from the 63rd Street Property.  In addition, Defendants have refused to provide any American Express bills for periods during which they claimed, and were reimbursed for, $193,633 in American Express charges; and, in periods for which they did provide American Express bills, Defendants claimed, and were reimbursed for, $26,816 in "phantom" American Express charges in excess of the charges reflected on those bills.

172.    To date, Nelson and, at his direction, Keystone have refused and failed to produce receipts and other documentation to justify the charges allegedly for the 63rd Street Property for which CFH reimbursed them.

**Defendants' Ongoing Disregard for Legal Requirements**

173.    Defendant Nelson's disregard for legal requirements continues to this day.  On July 26, 2021, Nelson sent an email to CFH and the current manager of the 63rd Street Property stating, with respect to two rent-stabilized apartments, that "since they are way below market, they should be rented to friends if possible."  This reflected Nelson's continued intention to manipulate and circumvent the rent-stabilization laws and to use Keystone's management services for personal rather than corporate ends.

**Nelson's Treatment of the Other Entities As Alter Egos and Disregard for Corporate Distinctions**

174.    At all relevant times, Nelson was an owner and executive of Vintage, Keystone, Premier, and Legem, and he directed their management of Plaintiffs' properties.

175.    Nelson used his power as an owner and executive to treat Vintage, Keystone, Premier, and Legem as his alter egos and exercise complete domination and control over the operations, as evidenced by, among other things, Nelson's commingling of the expenses of the properties Vintage and Keystone nominally managed in a single American Express account; his direction of management fees to an entity (Legem) that had no contractual relationship with the managed properties; his manipulation of the management companies' services for personal rather than corporate ends, including providing reduced rents to his friends; and Defendants' use of common employees and a common office space, address, telephone number, and email address.

## COUNT I – VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C. §§ 1962(c), 1964(c) (ALL DEFENDANTS)

176.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 175 as though fully set forth herein.

177.    Nelson, Keystone, Vintage, Premier, and Legem consist of an individual and limited liability companies associated in fact, constituting an enterprise (the "Nelson Enterprise"). The Nelson Enterprise is an ongoing organization whose members continue to function to achieve the objectives of the Nelson Enterprise.  The members of the Nelson Enterprise, at a minimum, include Defendants Nelson, Keystone, Vintage, Premier, and Legem.

178.    Nelson, Keystone, Vintage, Premier, and Legem are all associated with the Nelson Enterprise.

179.    The Nelson Enterprise was and continues to be engaged in interstate commerce. The Nelson Enterprise's activities also affect interstate commerce.

180.    Nelson, Keystone, Vintage, Premier, and Legem did conduct and participate in the conduct of the Nelson Enterprise's affairs through a pattern of racketeering to accomplish the objectives of the Nelson Enterprise.

181.    Pursuant to and in furtherance of their racketeering scheme, Nelson, Keystone, Vintage, Premier, and Legem committed multiple related acts of fraud and fraudulent misrepresentations involving multiple violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) between 2015 and 2021 to steal Plaintiffs' property.  In particular, in connection with the fraudulent schemes and representations alleged above:

    a.  Each of the fraudulent management reports enumerated above was transmitted by email over the interstate facilities of the Internet, in furtherance of the fraudulent cost-shifting scheme and fraudulent Premier invoices;

b.  Defendants communicated with Plaintiffs and others by email over the interstate facilities of the Internet in furtherance of their fraudulent representations regarding the violations at 172 Rivington Street and 237 Henry Street;

c.  Defendants caused interstate transmissions by wire for the approval of each purchase and charge using the Vintage American Express card, all in furtherance of their fraudulent cost-shifting scheme;

d.  Each payment to American Express was transmitted by mail, in furtherance of the fraudulent cost-shifting scheme; and

e.  Defendants' false statements to DHCR and the New York City DOB, in furtherance of their fraudulent schemes alleged above, were transmitted by interstate wire and/or mail.

182.  Nelson, Keystone, Vintage, Premier, and Legem were successful in obtaining Plaintiffs' property.

183.  The acts of racketeering described above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5), in that they were perpetrated continuously from 2015 through January 2021.

184.  As a direct and proximate result of Nelson's, Keystone's, Vintage's, Premier's, and Legem's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in multiple ways, including but not limited to, the following:

a.  Defendants obtained payment from Plaintiff CFH for fraudulent expenses that were improperly charged to the 63rd Street Property;

b.  Plaintiffs were fraudulently induced to spend large sums on renovations based on false representations, as alleged above, that apartments would thereby be removed from rent stabilization;

c.  Plaintiffs are subject to significant rent rebates and penalties as a result of Defendants' fraudulent evasion of the rent-stabilization laws;

d.  Plaintiff 172 Rivington LLC was fraudulently induced to spend approximately $60,000 on modifications to an illegal duplex apartment based on Nelson's false representations, and is subject to fines, penalties, and other liability as a result of those false representations, as well as the substantial costs of remedying the illegality; and

e.  Plaintiff 237 Henry LLC was fraudulently induced to spend approximately $140,000 on modifications to an illegal duplex apartment based on Nelson's false representations, and is subject to fines, penalties, and other liability as a result of those false representations, as well as the substantial costs of remedying the illegality.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count I in their favor and against Defendants, ERIC NELSON, VINTAGE GROUP, LLC, KEYSTONE 63, LLC, PREMIER MAINTENANCE, LLC, and LEGEM HOLDINGS, LLC, for the following:

(i)  For compensatory damages in an amount to be proven at trial;

(ii)  For treble damages;

(iii)  For interest, attorney's fees, and costs; and

(iv)  For such other relief as the Court deems just and proper.

**COUNT II – BREACH OF FIDUCIARY DUTY/FAITHLESS SERVANT DOCTRINE (ALL DEFENDANTS)**

185.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18 as though fully set forth herein.

186.     By virtue of Defendants' status as managers of the 63rd Street Property and the Downtown Properties and Nelson's status as an owner under the TIC Agreement, Nelson, Keystone, Vintage, Premier, and Legem owed fiduciary duties to Plaintiffs.

187.     Further, Plaintiffs reposed trust and confidence in Nelson, Keystone, Vintage, Premier, and Legem that they would fulfill their duties to manage the 63rd Street Property and the Downtown Properties in good faith and in a lawful manner.

188.     Nelson, Keystone, Vintage, Premier, and Legem breached their fiduciary duties owed to Plaintiffs by *inter alia*:

a.  Repeatedly and continuously falsifying purported expenses, thereby causing the 63rd Street Property to pay for costs that properly belonged to Nelson's own properties;

b.  Using full-time employees of the 63rd Street Property to benefit Nelson's own properties;

c.  Providing false monthly management reports to CFH for the 63rd Street Property;

d.  Inducing CFH to approve apartment-upgrade expenses based on false statements, to further Defendants' fraudulent rent-deregulation scheme;

e.  Submitting false information to DHCR with fictitious tenants and rent amounts to circumvent New York's rent-stabilization laws;

f.  Submitting false statements and affidavits to DOB regarding the basement for Unit 1 at 172 Rivington;

g.  Falsely advising CFH that it could and should build out the basement for Unit 1 at 172 Rivington; and

h.  otherwise leaving the Downtown Properties in disrepair.

189.     Under the faithless servant doctrine followed by New York law, Defendants' repeated violation of their duties of loyalty by favoring their own interests over Plaintiffs' requires them to forfeit all fees paid to them.

190.     As a direct and proximate result of Nelson's, Keystone's, Vintage's, Premier's, and Legem's multiple breaches of their fiduciary duties, Plaintiffs have sustained damages.  These damages include *inter alia* the $302,733 paid to Defendants in management fees for the Downtown Properties, CFH's share of the $886,651 paid to Defendants in management fees for the 63rd Street Property, the costs of the construction work at 172 Rivington and 237 Henry, and the diminution in value of the units at the 63rd Street Property that are now stuck in rent stabilization.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC , pray for the entry of judgment on this Count II in their favor and against Defendants, ERIC NELSON, VINTAGE GROUP, LLC, KEYSTONE 63, LLC, PREMIER MAINTENANCE, LLC, and LEGEM HOLDINGS, LLC, for the following:

(i)      For compensatory damages in an amount to be proven at trial;

(ii)     For restitution of all management fees paid by Plaintiffs to Defendants;

(iii)    For punitive damages;

(iv)     For interest, attorney's fees, and costs; and

(v)      For such other relief as the Court deems just and proper.

### COUNT III – COMMON LAW FRAUD
### (ALL DEFENDANTS)

191.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 190 as though fully set forth herein.

192.    Defendants' actions set forth *supra* were an elaborate scheme to defraud Plaintiffs out of significant sums of money, increase managements fees to be collected by Defendants, and divert funds for use on Nelson's properties.

193.    In order to induce Plaintiffs to pay the amounts on the Vintage American Express card, Defendants represented to Plaintiffs *inter alia*: (1) the charges incurred by the superintendent for the 63rd Street Property related to Nelson's properties were for the 63rd Street Property; and (2) the monthly management reports contained figures for expenses that were solely related to the 63rd Street Property.

194.    To induce Plaintiffs to pay sums to Premier, Defendants falsely represented to Plaintiffs that Premier had done painting work at the 63rd Street Property.

195.    To induce Plaintiffs into making renovations on Unit 1 at 172 Rivington, Defendants misrepresented to Plaintiff that the basement of Unit 1 could properly be used as a living space under the regulations applicable to the property.

196.    To induce Plaintiffs into making renovations on Unit 1D at 237 Henry, Defendants misrepresented to Plaintiff that the basement of Unit 1D could properly be used as a living space under the regulations applicable to the property.

197.    Defendants similarly falsely represented to Plaintiffs that funding improvements to various units at the 63rd Street Property would permit those units to be removed from rent-stabilization limits, and further falsely represented to Plaintiffs that Defendants were filing proper documentation with government authorities concerning these units.

198.    Plaintiffs reasonably relied upon Defendants' representations when they expended various sums to make improvements, authorized leases at rental amounts falsely represented to them to be permissible rents, and paid the American Express and other charges submitted by Defendants.

199.     Each of the representations made by Defendants as alleged *supra* was false at the time and place they were made to Plaintiffs, and Plaintiffs have suffered harm from their reliance upon Defendants' representations.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count IV in their favor and against Defendants, ERIC NELSON, VINTAGE GROUP, LLC, KEYSTONE 63, LLC, PREMIER MAINTENANCE, LLC, and LEGEM HOLDINGS, LLC, for the following:

(i)      For compensatory damages in an amount to be proven at trial;

(ii)     For punitive damages;

(iii)    For interest, attorney's fees, and costs; and

(iv)     For such other relief as the Court deems just and proper.

### COUNT V – BREACH OF CONTRACT
### (ERIC NELSON)

200.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 199 as though fully set forth herein.

201.     The respective management agreements for each of the subject properties are valid and enforceable contracts under New York law.

202.     Nelson, through his alter egos Keystone and Vintage, has breached his obligations under the respective management agreements as alleged above.

203.     In addition, the management agreement for each of the subject buildings expressly provides that the management fee "shall not exceed the fair market value for the services rendered by Agent."

204.     Through payments to his controlled entity Legem, Nelson took his share of management fees that totaled approximately $302,733 for the Downtown Properties and approximately $886,651 for the 63rd Street Property.

205.     In light of Defendants' misfeasance and malfeasance, those fees were far in excess of the fair market value of Defendants' services.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count V in their favor and against Defendant ERIC NELSON for the following:

(i)      For compensatory damages in an amount to be proven at trial;

(ii)     For restitution of all management fees paid to Defendant;

(iii)    For interest, attorney's fees, and costs; and

(iv)    For such other relief as the Court deems just and proper.

## COUNT VI – BREACH OF CONTRACT
## (VINTAGE GROUP, LLC)

206.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 205 as though fully set forth herein.

207.     The respective management agreements for each of the subject properties are valid and enforceable contracts under New York law.

208.     Vintage has breached its obligations under the respective management agreements as alleged above.

209.     In addition, the management agreement for each of the subject buildings expressly provides that the management fee "shall not exceed the fair market value for the services rendered by Agent."

210.    Through payments to Legem, Vintage took its share of management fees that totaled approximately $302,733 for the Downtown Properties.

211.    In light of Defendants' misfeasance and malfeasance, those fees were far in excess of the fair market value of Defendants' services.

WHEREFORE, Plaintiffs, 172 RIVINGTON PROPERTY, LLC and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count VI in their favor and against Defendant VINTAGE GROUP, LLC for the following:

(i)      For compensatory damages in an amount to be proven at trial;

(ii)     For restitution of all management fees paid to VINTAGE GROUP, LLC;

(iii)    For interest, attorney's fees, and costs; and

(iv)     For such other relief as the Court deems just and proper.

## COUNT VII – BREACH OF CONTRACT
### (KEYSTONE 63, LLC)

212.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 211 as though fully set forth herein.

213.    The management agreement for the 63rd Street Property is a valid and enforceable contract under New York law.

214.    Keystone has breached its obligations under the management agreement as alleged above.

215.    In addition, the management agreement expressly provides that the management fee "shall not exceed the fair market value for the services rendered by Agent."

216.    Through payments to Legem, Keystone took management fees that totaled approximately $886,651 for the 63rd Street Property.

217.   In light of Keystone's misfeasance and malfeasance, those fees were far in excess of the fair market value of Keystone's services.

WHEREFORE, Plaintiff CFH EAST 63, LLC prays for the entry of judgment on this Count VII in its favor and against Defendant KEYSTONE 63, LLC for the following:

(i)   For compensatory damages in an amount to be proven at trial;

(ii)   For restitution of all management fees paid to KEYSTONE 63, LLC;

(iii)   For interest, attorney's fees, and costs; and

(iv)   For such other relief as the Court deems just and proper.

### COUNT VIII – RESTITUTION
### (ALL DEFENDANTS)

218.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 217 as though fully set forth herein.

219.   As a consequence of the foregoing, Plaintiff have suffered financial loss in the amount of at least $1,000,000.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count VIII in their favor and against Defendants, ERIC NELSON, VINTAGE GROUP, LLC, KEYSTONE 63, LLC, PREMIER MAINTENANCE, LLC, and LEGEM HOLDINGS, LLC, for the following:

(i)   For restitution in an amount to be proven at trial;

(ii)   For interest, attorney's fees, and costs; and

(iii)   For such other relief as the Court deems just and proper.

### COUNT IX – ACCOUNTING
### (ALL DEFENDANTS)

220.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 219 as though fully set forth herein.

221.    By virtue of Defendants' status as managers of the 63rd Street Property and the Downtown Properties and Nelson's status as an owner under the TIC Agreement, Nelson, Keystone, Vintage, Premier, and Legem owed fiduciary duties to Plaintiffs, including a duty to account for all funds expended on behalf of the 63rd Street Properties and the Downtown Properties.

222.    Nelson, Keystone, Vintage, Premier, and Legem have breached the fiduciary duties they owe to Plaintiffs by *inter alia* failing to provide a proper account of the funds they have expended and charged CFH.

223.    As a result, Plaintiffs are entitled to an accounting of the amounts Nelson, Keystone, and Vintage allegedly incurred on behalf of the 63rd Street Property and the Downtown Properties.

WHEREFORE, Plaintiffs, CFH EAST 63, LLC, 172 RIVINGTON PROPERTY, LLC, and 237 HENRY PROPERTY, LLC, pray for the entry of judgment on this Count IX in their favor and against Defendants, ERIC NELSON, VINTAGE GROUP, LLC, KEYSTONE 63, LLC, PREMIER MAINTENANCE, LLC, and LEGEM HOLDINGS, LLC, for the following:

(i)    An order directing Defendants to provide an accounting (including producing all receipts) for all amounts charged on the Vintage American Express card and submitted to CFH for payment;

(ii)    A judgment against Defendants in the amount of charges for which Defendant cannot produce adequate documentation;

(iii)    Interest, attorney's fees, and costs; and

(iv)    For such other relief as the Court deems just and proper.

***TRIAL BY JURY DEMANDED***

Dated: August 19, 2021
New York, New York

Respectfully submitted,

By: */s/ Meir Feder*
         _____

        Meir Feder
        Harold K. Gordon
        Kent R. Richey
        Justin B. Harris
        JONES DAY
        250 Vesey Street
        New York, New York 10281-1047
        Telephone: (212) 326-3939
        mfeder@jonesday.com
        hkgordon@jonesday.com
        krrichey@jonesday.com

        *Attorneys for Plaintiffs CFH East 63, LLC; 172
        Rivington Property, LLC; and 237 Henry
        Property, LLC*